Mary Messer, Plaintiff-Appellant,
v.
Lynn T. Martin, M.D., Gundersen Clinic Ltd. and Gundersen Clinic Professional Liability Insurance Plan, Defendants-Respondents.
No. 04-0264-FT.
Court of Appeals of Wisconsin.
Opinion Filed: May 27, 2004.
Before Deininger, P.J., Dykman and Higginbotham, JJ.
¶ 1. PER CURIAM.
Mary Messer appeals a summary judgment order that dismissed her medical malpractice action against Dr. Lynn Martin, the Gunderson Clinic and the clinic's insurer (collectively, the clinic). We affirm for the reasons discussed below.

BACKGROUND
¶ 2. This suit arises from injuries which Messer suffered when she fainted and hit her head in an elevator at the Gunderson Clinic shortly after undergoing a surgical procedure performed by Martin under local anesthesia. Messer alleged that clinic personnel were negligent for failing to give her adequate postoperative instructions, failing to monitor her vital signs during or after the procedure, and allowing her to leave alone without first determining her ability to ambulate.
¶ 3. Messer retained a registered nurse, Carolyn Hankinson, to provide an expert opinion in support of her claims. After reviewing the medical records but before looking at any outside literature, Hankinson stated in a deposition that she was concerned, among other things, that the attending nurse had not monitored Messer's vital signs during or after the procedure and that the nurse had permitted Messer to leave alone after the procedure although Messer had complained of some dizziness. Hankinson said it would be standard procedure to take a patient's blood pressure, pulse, and EKG during a procedure, although she acknowledged that the expectation of nurses could vary in different locations with respect to some procedures performed under only a local anesthetic. Hankinson noted that the lidocaine and epinephrine administered, the fluids and tissues removed, or Messer's reaction to the surgery itself could have had the hemodynamic effect of lowering Messer's blood pressure, and that taking Messer's vital signs would have revealed if that was the case. Hankinson stated that blood pressure could drop precipitously or could drop more slowly over a period of time. [J:48-49] She indicated that she could not reach a conclusion as to which had happened in this case without speculation. Since there was no way to know whether Messer had had a normal blood pressure and pulse when she left the office, Hankinson conceded it was possible that Messer's vital signs had dropped quickly after she left. Hankinson also could not say whether the medications Messer had been taking prior to the procedure had played any role in the incident or whether Messer's injuries could have been prevented if someone was accompanying her.
¶ 4. After reviewing literature regarding nursing standards, Hankinson provided an affidavit in which she concluded that the attending nurse had a duty to inquire what medication Messer was taking, to take Messer's blood pressure and pulse, to report Messer's slight dizziness immediately following the procedure to the doctor, to recognize the possibility of lidocaine toxicity or a vasovagal episode, and to advise Messer against leaving alone after a procedure performed under lidocaine. Hankinson did not, however, opine that the incident had actually been caused by a drug reaction or that Messer's blood pressure must already have dropped before she was discharged. Rather, Hankinson concluded in her affidavit it was "more likely than not" that, if the attending nurse had taken Messer's vital signs, she would have discovered they were abnormal and kept Messer from leaving prematurely, thus avoiding the fainting episode in the elevator.

DISCUSSION
¶ 5. This court reviews summary judgment decisions de novo, applying the same method employed by the circuit court. Brownelli v. McCaughtry, 182 Wis. 2d 367, 372, 514 N.W.2d 48 (Ct. App. 1994).
We first examine the complaint to determine whether it states a claim, and then we review the answer to determine whether it joins a material issue of fact or law. ... [Next,] we examine the moving party's affidavits to determine whether they establish a prima facie case for summary judgment. If they do, we look to the opposing party's affidavits to determine whether there are any material facts in dispute that entitle the opposing party to a trial.
Frost v. Whitbeck, 2001 WI App 289, ¶6, 249 Wis. 2d 206, 638 N.W.2d 325 (citations omitted). An affidavit which contradicts deposition testimony without explanation for the discrepancy is generally insufficient to create a genuine issue of fact. Yahnke v. Carson, 2000 WI 74, ¶21, 236 Wis. 2d 257, 613 N.W.2d 102.
¶ 6. A claim for medical malpractice, like any claim for negligence, requires four elements: (1) a breach of (2) a duty owed (3) that results in (4) an injury or injuries or damages. Paul v. Skemp, 2001 WI 42, ¶17, 242 Wis. 2d 507, 625 N.W.2d 860. Expert testimony is required to establish liability in an action for medical malpractice. Kasbaum v. Lucia, 127 Wis. 2d 15, 20, 377 N.W.2d 183 (Ct. App. 1985).
¶ 7. The clinic does not dispute that Messer stated a claim for medical malpractice in her complaint. Rather, it contends that she failed to produce sufficient materials to support her claim because Hankinson was not qualified to render an expert opinion; Hankinson's affidavit was a sham because it contradicted her deposition testimony as to whether the standard of care had been violated; and Hankinson's deposition testimony did not establish either the violation of a standard of care or causation.
¶ 8. We are satisfied that Hankinson was qualified by her years of practice as a nurse to give an expert opinion on the standard of care given by the nurse who attended Messer's procedure as well as on causation of injuries when nursing standards are not met. We agree with the trial court, however, that Hankinson's affidavit could be disregarded as a sham because it contradicted her deposition testimony on several key points.
¶ 9. For instance, Hankinson stated at the deposition that there was no written law mandating that vital signs be taken during a procedure performed under local anesthesia and that local practices could vary, but asserted in her affidavit that vital signs should always be taken when a local anesthetic is used. Hankinson also testified at her deposition that she could only speculate as to whether Messer's blood pressure was already abnormal during or immediately after the procedure or whether it dropped precipitously after Messer was discharged, but stated in her affidavit that taking Messer's vital signs prior to discharge would have revealed abnormalities.
¶ 10. Hankinson reviewed nursing literature after giving her deposition, and this could explain to some extent the change in her position as to the universality of the standard of care for taking vital signs during a procedure performed under local anesthesia. (Hankinson did not explain, however, why she could not have reviewed such materials prior to the deposition.) There is nothing in the affidavit that explains how or why Hankinson had departed from her earlier acknowledgement that Messer's blood pressure could have dropped precipitously after she was discharged, and that Hankinson could only speculate as to what Messer's blood pressure or pulse were during and immediately after the procedure. Indeed, Messer once again concedes in her brief on this appeal that Hankinson had no way to determine what Messer's blood pressure would have been if it had been taken prior to discharge. This concession is fatal to her claim.
¶ 11. If Messer can offer no expert testimony that her blood pressure was indeed abnormal prior to discharge, then she cannot show that taking her vital signs prior to discharge would have prevented the fainting episode, regardless whether the omission violated the standard of care. In other words, Messer has failed to establish a prima facie case on the issue of causation. Accordingly, the trial court properly dismissed this action on summary judgment.
By the Court.Order affirmed.